George F. NYE, Gerald J. Sterner, and Thomas E. Mulcahy, Individually and as a Joint Venture Doing Business in the Name of Gerald J. Sterner, Cross-Appellants,

v.

BLYTH EASTMAN DILLON & COMPANY, INC., a Delaware Corporation, Richard Newham, and Harold Covlin, Cross-Appellees.

George F. NYE, Gerald J. Sterner, Thomas E. Mulcahy, Individually and as a Joint Venture Doing Business in the Name of Gerald J. Sterner, Appellees,

v.

Richard NEWHAM, Appellant.

George F. NYE, Gerald J. Sterner, Thomas E. Mulcahy, Individually and as a Joint Venture Doing Business in the Name of Gerald J. Sterner, Appellees,

v.

BLYTH EASTMAN DILLON AND COMPANY, INC., a Delaware Corporation, and Harold Covlin, Appellants.

Nos. 78–1037, 78–1074 and 78–1085.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1978.

Decided Dec. 1, 1978.

Rehearing Denied Dec. 26, 1978.

1192

Thomas W. Kelly of Breed, Abbott & Morgan, New York City, for appellant, Blyth Eastman Dillon & Co., Inc.

James H. O'Hagan of Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., for appellant, Harold Covlin; Thomas W. Kelly, New York City, Darron C. Knutson, Minneapolis, Minn., and Charles Siegel of Blyth Eastman Dillon & Co., Inc., New York City, on the brief.

Miles E. Efron of Efron & Roberts, Minneapolis, Minn., for appellant, Richard Newham; George W. Roberts, Minneapolis, Minn., on the brief.

Samuel L. Hanson of Briggs & Morgan, St. Paul, Minn., for appellees; Jeffrey F. Shaw, St. Paul, Minn., on the brief.

Before HEANEY and STEPHENSON, Circuit Judges, and VAN SICKLE,* District Judge.

HEANEY, Circuit Judge.

Blyth Eastman Dillon and Company, Inc., Richard Newham and Harold Covlin appeal from a judgment in the amount of $759,313 entered against them after a non-jury trial. The trial court found that the appellants had violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, because of their conduct involving an investment account maintained by George Nye, Gerald Sterner and Thomas Mulcahy with Blyth Eastman. The trial court also found that the appellants had committed common law fraud. The appellants argue that several of the trial court's factual findings with respect to liability are clearly erroneous and that the trial court's computation of damages was improper. Nye, Sterner and Mulcahy, the appellees and the plaintiffs in the District Court cross-appeal from the decision of the trial court denying them prejudgment interest.[1] For the reasons outlined below, we affirm the trial court's liability findings and, in substantial part, its damage award. With respect to certain elements of its damage award, we reverse and remand for further proceedings.

## I. Factual Background.

George Nye, Gerald Sterner and Thomas Mulcahy were officers, directors and members of the executive committee of Sterner Lighting Company. On September 10, 1970, they established a joint venture for the purpose of acquiring and trading securities. The joint venture was formed primarily to produce funds for the purchase of Joe Sterner's interest in Sterner Industries, a holding company for a substantial block of Sterner Lighting Company.[2] Joe Sterner, an older brother of Gerald Sterner, had expressed a desire to leave the business. The purchase price was estimated to be between $350,000 and $500,000. To accomplish their objective, the appellees opened between eight and ten new accounts for the joint venture with several brokerage firms, including Blyth Eastman Dillon and Company.

The events surrounding the opening of the Blyth Eastman account occurred prior to October 1, 1970. Richard Newham, a registered representative or broker for Blyth Eastman, contacted Sterner at his office for the purpose of soliciting his business. Shortly thereafter, Sterner opened an account for the joint venture with Blyth

---

* BRUCE M. VAN SICKLE, United States District Judge for the District of North Dakota, sitting by designation.

1. The trial court also found that Newham, in his capacity as broker, had not engaged in churning the appellees' investment account. Churning involves excessive trading activity in an account over which a broker exercises control. The appellees do not cross-appeal from this finding.

2. Sterner Industries was a close corporation, while Sterner Lighting Company was publicly held.

Eastman.[3] The account was established as a non-discretionary one, that is, Newham could not purchase or sell securities held in the account without the consent of one of the joint venturers. The appellees did not, at any time, authorize Newham or any other person to make discretionary trades in the account.

In order to induce the appellees to open the account, Newham misrepresented his credentials as a broker. Newham told the appellees that he was one of Blyth Eastman's top producers; that he was experienced in the brokerage business; that he had worked his way up through the firm for several years; that he handled only a select number of major accounts; and that he utilized additional research sources not available to Blyth Eastman at a personal cost of $1,000 to $1,200 a month. Newham also represented that his status in the firm allowed him to obtain a greater share of new securities issues than was available to other brokers.

In truth, Newham was a novice broker. He had been licensed on July 15, 1970. He had failed the New York Stock Exchange examination the first time he took it in March, 1970. Newham had no large accounts and had no special training or research sources. His status with the firm entitled him to less than an average share of new issues.

Newham's false representations were supported by the management of Blyth Eastman. James Clearly, Blyth Eastman's managing partner for the Sales and Branch Office Division, in a letter dated October 9, 1970, acknowledging the opening of the account, assured the appellees that "a thoroughly experienced account executive is representing your interests." Harold Covlin, the branch manager at Blyth Eastman's Minneapolis office, confirmed these misrepresentations when the appellees subsequently complained about Newham's conduct and threatened to change brokers or brokerage firms. Covlin maintained that Newham was his best broker and that nobody was as

conscientious in his analysis of the market. Covlin was Newham's supervisor in the Minneapolis office.

There was substantial activity in the account from October, 1970, until July, 1972, when Newham and Covlin left Blyth Eastman. At its peak, the appellees' investment in the account approximated $400,000 to $450,000, all of it representing bank borrowings. This investment supported a total investment of approximately $750,000 to $800,000 because the account was established on a margin basis. We now examine the relevant transactions in which the trial court found liability.

### A. Walter Kidde, Universal Foods and Nicolet Instrument.

In this group of transactions the trial court found that Newham had made unauthorized discretionary purchases which resulted in losses to the appellees when they were subsequently sold.

On October 20, 1970, Newham purchased 1,000 shares of Walter Kidde for $26,963. The appellees had previously told both Newham and Covlin that they were not interested in the stock. They never authorized Newham to make the purchase. Upon learning of the purchase, they immediately instructed Newham to sell. Newham delayed doing so until October 28, 1970, when he sold the shares for $19,557. This represented a loss of $7,406. The appellees complained to Covlin about the loss. Covlin stated that it would not happen again. He did not, however, offer to make up the loss.

On March 30, 1971, Newham made an unauthorized purchase of 3,700 shares of Universal Foods for $129,500. The appellees had some Universal Foods stock in their account. They did not, however, authorize the purchase of the 3,700 shares. The appellees ordered Newham to cancel the purchase. Newham did so with respect to 2,000 shares, representing $70,000 of the purchase price. He sold the remaining shares on April 2, 1971, for $42,700. Since

---

**3.** The joint venture did business in Sterner's name and the account was set up in Sterner's name only. A copy of the joint venture agreement, however, was filed with Blyth Eastman.

the cost of the 1,700 remaining shares was $59,500, the appellees incurred a loss of $6,800.

Newham made another unauthorized purchase of stock on July 7, 1971. He purchased 2,500 shares of Nicolet Instrument for $31,512. Newham had previously tried to talk the appellees into buying the stock, but they had refused. After learning of the purchase, the appellees instructed Newham to sell. The shares were sold on August 6, 1971, for $28,150 representing a loss of $3,362. The total loss for the three unauthorized purchases was $17,568, which was the amount of damages awarded by the trial court.[4]

By August 1, 1971, Covlin had reassured the appellees that their account would be handled properly. Although the securities held in the appellees' account had suffered a decline in market value, resulting in an unrealized loss of $90,000, the appellees were satisfied with their holdings and expected the market value to recover. This was not an unrealistic expectation since the appellees would have made a $60,000 profit if they had held the securities until February, 1972, only six months later. Additional transactions, however, occurred subsequent to August 1, 1971, which resulted in additional losses to the appellees.

### B. Frigitronics.

On August 6, 1971, Newham purchased 6,000 shares of Frigitronics for $247,462 without the appellees' authority. Frigitronics was, at the time of the transaction, an over-the-counter stock.[5] Its principal areas of business were in eye care, surgical instruments and medical and hospital supplies. Frigitronics had developed a plastic contact lens, which was softer and gentler to the user than the glass lenses currently in use. This new lens could not be marketed, however, without the approval of the Food and Drug Administration (FDA). The FDA had not granted approval by August 6, 1971.

The appellees had discussed Frigitronics with Newham prior to August 6, 1971. Newham was looking for a way to make up the unrealized loss that the appellees incurred as a result of the decline in market value of their portfolio. He was very enthusiastic about Frigitronics' prospects. The appellees, however, did not authorize him to make any purchases.

After learning of the purchase, the appellees immediately contacted Newham. Newham assured them that he knew what he was doing. He made several claims including the following: (1) Blyth Eastman had researched the stock and highly recommended it; (2) he personally had a long position in Frigitronics shares; (3) he had access to inside information from Frigitronics' officials; (4) the price of the stock would climb rapidly to a price of $100 a share. Newham assured the appellees that their account had sufficient funds to cover the purchase because he had rearranged it and moved stocks out of cash into margin.

These representations were all false. Frigitronics was never on the Blyth Eastman recommended list. In fact, Newham failed to disclose that Blyth Eastman considered Frigitronics to be a high risk stock. Newham did not have a long position in Frigitronics stock at the time of the appellees' purchase. Rather he was engaged in short-term "in and out" trading. Newham did not have access to any inside information from Frigitronics. He did not know, or have any reasonable ground for claiming, that Frigitronics stock would climb rapidly in price to $100 a share. In order to fund the purchase, Newham made unauthorized sales of 3,000 shares of Pacific Southwest Airlines, 2,000 shares of Union Corporation, 1,500 shares of United Refining and 2,500 shares of Nicolet Instrument. The sales of these four stocks produced a realized loss to the appellees of about $51,107.

---

4. Newham made several other unauthorized purchases. These, however, were promptly cancelled, and the appellees incurred no losses.

5. Frigitronics became listed on the American Stock Exchange on October 19, 1972, and on the New York Stock Exchange during October, 1976.

The appellees did not immediately accept these representations. At their suggestion, Newham and Covlin met with them to discuss the transaction shortly after August 6, 1971. Covlin confirmed Newham's representations. He assured the appellees that Frigitronics would allow them to recover all of their losses, including the losses from the unauthorized sales of the four stocks used to fund the purchase. The trial court found that these misrepresentations and omissions of Covlin and Newham were material and successfully induced the appellees to stay in Frigitronics and make no further complaints about the sale of the four stocks which funded the Frigitronics purchase.

The price of Frigitronics stock fell rapidly after the appellees' purchase. By November 26, 1971, the price had declined from the $41 price at which the appellees had made their purchase, to $26 a share. Newham recommended that the appellees "average down." [6] The appellees agreed and authorized the purchase of 2,000 shares. Newham assured them that there were sufficient funds in their account to cover the purchase, and the trial court found that this was a primary inducement in securing the authorization. This was untrue, however, and Newham, without authorization, sold 2,400 shares of Hyatt Corporation to fund the second purchase. This sale resulted in a loss of $16,000.

On December 16, 1971, Newham made an unauthorized purchase of 2,000 shares of Frigitronics. In doing so, he made an additional unauthorized sale of 1,400 shares of Hyatt Corporation resulting in a loss of $4,375. The appellees complained again. Newham told them that they needed a 10,000-share position in Frigitronics and repeated the various misrepresentations he had previously made. These last two purchases cost $123,184 and increased the overall acquisition cost of the Frigitronics stock to $370,657.

The 10,000 shares of Frigitronics were sold out of the appellees' account in various amounts from October, 1972, to February, 1974.[7] These sales generated proceeds of $161,584. When compared with the acquisition cost, the Frigitronics' transactions produced a loss of $209,073, which was the amount awarded by the trial court.

### C. National Liberty and Lennar Corporation.

In this group of transactions, the trial court found that Newham had refused to execute sell orders given by the appellees which resulted in losses when the stock was subsequently sold at a lower price.

The appellees had authorized a purchase of 1,000 shares of National Liberty on January 24, 1972. On February 1, 1972, Newham made an unauthorized purchase of 2,000 shares of National Liberty. The funds to cover the purchase were obtained by making unauthorized sales of 1,000 shares of Mission Equities and 2,000 shares of Hyatt Corporation.[8] The appellees ratified the purchase after receiving assurances from Newham that National Liberty was a good stock. The overall acquisition cost of National Liberty was $142,250.

The appellees ordered the stock sold on May 23, 1972, when the value of National Liberty in their account was $156,000. All 3,000 shares were sold later in various amounts generating proceeds of $65,313.[9] The trial court's damage award was composed of two parts: (1) the difference between the market value on May 23, 1972, and the acquisition cost, or $13,750; and (2)

---

6. This is a procedure used to decrease the average cost of the investment.

7. The appellees' exhibit shows that 1,000 shares were sold on October 12, 1972; 3,000 shares on October 16, 1972; 400 shares on March 22, 1973; 2,000 shares on March 30, 1973; 500 shares on May 2, 1973; 1,100 shares on May 3, 1973; 700 shares on May 9, 1973; and 1,300 shares on February 6, 1974.

8. These sales resulted in a total profit on the funding of National Liberty of $6,716.

9. National Liberty split three-for-two near the end of May. These individual shares were sold as follows: 1,000 shares on October 12, 1972; 1,000 shares on October 16, 1972; 1,000 shares on May 3, 1973; and 1,500 shares on May 29, 1973; a total of 4,500 post-split shares.

the difference between the acquisition cost and the sales proceeds, or $76,937. The total damages were $90,687.

On February 15, 1972, Newham made an unauthorized purchase of 1,900 shares of Lennar Corporation for $68,963. The appellees immediately ordered Newham to sell, but Newham did not comply. The stock had, by this time, increased to a market value of $75,051. Newham failed to respond to another sell order. The shares were finally sold on March 22, 1973, and May 2, 1973, for a total amount of $18,554. The trial court awarded damages in similar fashion to the National Liberty damages. Damages as of the date of the sell order were $6,088, and damages until the actual selling date were $50,409. Total damages were $56,497.

At the end of May or early June, 1972, the appellees held a meeting with Covlin and Newham. They told Covlin and Newham that they were going to transfer their account to another firm. Covlin at this point, misrepresented to the appellees that a transfer would be very costly. He stated that a transfer would require the payment of a commission going out of their firm and one going into another firm. He also stated that the account was undermargined, requiring additional funds to be paid to Blyth Eastman before a transfer could be made. Relying on these misrepresentations, the appellees did not transfer the account.

By July 31, 1972, Covlin and Newham left Blyth Eastman. Thereafter, the appellees declined to make further stock purchases in their account. The stock holdings in the account were gradually liquidated as the value of the holdings declined and margin calls were met.

## II. Liability Findings.

■ The appellants initially contend that several of the trial court's findings with respect to liability are clearly erroneous. See Fed.R.Civ.P. 52(a). A finding is

clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). A finding is not clearly erroneous merely because a different result might have been reached had the case been tried originally to the appellate court. *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 155 (8th Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d ·792 (1978). Given these standards, we conclude that the findings of the trial court are not clearly erroneous.

### A. Frigitronics.

The appellants' principal attack is made on the trial court's findings with respect to the Frigitronics transactions. In essence, they argue that Newham's and Covlin's misrepresentations and omissions could not have induced the appellees to purchase the Frigitronics stock in light of their knowledge of Frigitronics and securities trading experience. The appellants also argue that they cannot be liable because the appellees "ratified" the unauthorized purchases of Frigitronics and the unauthorized sales of the four securities to fund the purchase of Frigitronics.

The appellees acknowledge that they had done some research on Frigitronics prior to August 6, 1971, when the first purchase of 6,000 shares was made. They knew, for example, that Frigitronics needed to secure FDA approval prior to marketing its plastic or "soft" lens and that the growth potential ·of Frigitronics stock depended on the success of the soft lens. The appellants argue that the appellees, knowing of this contingency, cannot complain now about the declining value of Frigitronics stock because the FDA did not approve the soft lens.[10]

The appellants emphasize that Nye, Sterner and Mulcahy were not neophytes in the

---

**10.** FDA approval was not forthcoming because medical researchers had discovered substantial bacterial contamination on the lenses. Further background into the difficulties experienced by

the optical industry in developing the soft lens and its impact on the stock exchange is provided in *S.E.C. v. Bausch & Lomb Inc.*, 565 F.2d 8, 10–11 (2d Cir. 1977).

securities industry. The appellees concede that they were experienced investors. The appellants also emphasize that Newham sent the appellees a considerable amount of written material explaining the problems that Frigitronics faced in securing FDA approval.[11]

■ The appellees' knowledge and experience, however, must be examined in light of Newham's and Covlin's misrepresentations and omissions. The sophistication of the appellees is not sufficient, in and of itself, to preclude recovery. It is only one factor to be considered in determining the overall reasonableness of their reliance on the information in making an investment decision.[12] Similarly, the information provided to the appellees by Newham is only an additional factor to be weighed in making a finding of reasonable reliance.[13]

■ Newham represented that he was an experienced broker with access to information not ordinarily available to other brokers. He assured the appellees that their stock would rapidly increase in value. His representations that he had connections with Frigitronics' officials, that he was himself investing in Frigitronics and that Blyth Eastman highly recommended the stock lent credence to that assurance. These misrepresentations were repeatedly confirmed by Covlin. We conclude, after reviewing the record, that the trial court was not clearly erroneous in determining that the appellees reasonably relied on these misrepresentations in their investment decision.[14]

■ We also conclude that the appellees are not precluded from recovery because they ratified the various Frigitronics transactions. The underlying fallacy in the appellants' argument is the assumption that the ratification was knowingly made because the appellees knew of the transactions and were in constant communication with Newham concerning them. An effective ratification requires that a party be put on notice as to the true state of affairs. This never occurred in regard to the Frigitronics transactions. Rather, the misrepresentations and omissions were continuing in nature and included the actual inducement to ratify.

### B. Remaining Transactions.

■ The appellants argue that the trial court's liability findings with respect to the unauthorized purchases of Walter Kidde, Universal Foods and Nicolet Instrument and to the unauthorized sales of Lennar and National Liberty are clearly erroneous. In essence, they are asking this Court to reweigh the evidence. We decline to do so. We conclude that the findings are not clearly erroneous.

### III. Damages.

Blyth Eastman, Newham and Covlin also appeal from various aspects of the trial court's damage award.[15]

---

11. This information, however, was only supplied *after* the initial unauthorized purchase of 6,000 shares.

12. The trial court also determined that the misrepresentations and omissions were material. Materiality and reliance in this action are closely related concepts used to establish causation in fact. *See McLean v. Alexander*, 420 F.Supp. 1057, 1075–1077 (D.Del.1976).

13. The appellants make much of the fact that the appellees had made several investments in Frigitronics' stock in their various brokerage accounts with other firms. It is clear, however, that these were short-term investments designed to take advantage of daily fluctuations in Frigitronics' stock and not long-term investments such as the one with Blyth Eastman.

14. The appellants attempt to separate out each misrepresentation and show that each was insufficient to mislead the appellees. Such a position has little merit. Considered in the aggregate, we agree with the trial court that the misrepresentations did induce reliance on the part of the appellees.

The appellants also argue that the trial court was clearly erroneous in finding that the misrepresentations were made intentionally. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). We conclude that this finding was not clearly erroneous.

15. They have not appealed from the trial court's determination that Blyth Eastman was a controlling person under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), and, thus, jointly and severally liable for damages.

### A. Frigitronics.

The damage award for the various Frigitronics' transactions is composed of three parts: (1) $209,073—which was the difference between the acquisition cost of the Frigitronics stock and the sales proceeds; (2) $68,120—which is the realized loss from the unauthorized sales of the four securities used to fund the purchases of Frigitronics;[16] and (3) the "market value losses" attributed to the unauthorized sales of the four securities. The third element will be explained in greater detail below. Although the appellants have argued against the fraudulent nature of the unauthorized sales of the four securities, they have not appealed the amount of damages as calculated by the trial court. They strenuously argue against the award of $209,073 on the ground that it is unfair to charge them with a decline in market value that occurred long after Colvin and Newham left Blyth Eastman, and after the appellees were no longer relying on the misrepresentations. See n.7, supra.

 It is true that in fashioning an appropriate damage measure in a Rule 10b–5 action, "[the Court's] function is to fashion the remedy best suited to the harm." *Garnatz v. Stifel, Nicolaus & Co., Inc.,* 559 F.2d 1357, 1360 (8th Cir. 1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978). A variety of remedies have been fashioned to provide recovery to an injured party. See Jacobs, *The Measure of Damages in Rule 10b–5 Cases,* 65 Geo. L.J. 1093 (1977); Mullaney, *Theories of Measuring Damages in Securities Cases and the Effects of Damages on Liability,* 46 Fordham L.Rev. 277 (1977). We conclude, however, that the trial court erred in awarding damages based on sales which occurred long after the appellees were influenced by Covlin's and Newham's misrepresentations.

 The relevant time period is the date the appellees no longer relied on the misrepresentations in making their investment decision. Thereafter, the appellees had a reasonable time in which to make a "second investment decision" to either hold the shares or sell them and reinvest the proceeds elsewhere. See *Harris v. American Investment Company,* 523 F.2d 220 (8th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976). Any increase or decrease in the value of the stock after a reasonable time is causally unrelated to the initial decision to purchase and can serve to neither decrease nor increase the amount of damages. See *id.; Cant v. Becker & Co., Inc.,* 379 F.Supp. 972, 975 (N.D.Ill.1974).

 The purpose of the reasonable time period is to enable an individual to decide whether to replace the stock or to retain it. Obviously, the reasonable time period will vary with the circumstances. It should, however, give the owner of the stock an opportunity to consult counsel, employ another broker and to analyze the market. *Hornblower & Weeks-Hemphill Noyes v. Lazere,* 301 Minn. 462, 474, 222 N.W.2d 799, 806–807 (1974). The appellees testified that they no longer relied on Newham's advice after he left Blyth Eastman in the latter part of July, 1972. Thus, we must remand this action to the trial court in order to determine the reasonable time the appellees had to make a new investment decision after the end of July, 1972. On remand, the trial court may take additional evidence and shall make additional findings with respect to the time needed to consult counsel, employ another broker and analyze the market. Given the relative sophistication of the appellees and their constant contact with brokers, however, we conclude that the time allowed shall not be in excess of two months.[17]

---

16. The actual realized loss from the unauthorized sales was $71,482. Of this amount, $3,362 represented the loss from the sale of Nicolet Instrument. Since this amount had already been awarded as damages, it was subtracted from the realized loss to prevent a double recovery.

17. The market value of Frigitronics on July 31, 1972, was $23 per share, or a total value of $230,000. Thus, the appellees would be entitled to recover no less than $140,657.

■ The trial court found that the new investment decision theory was inapplicable because the appellees were placed in an economically unreasonable position by the activities of Newham and Covlin. There may be circumstances in which economic reasonableness dictates that an individual should continue to follow the same course of conduct after he discovers the existence of a fraud. *See Clements Auto Company v. Service Bureau Corporation,* 444 F.2d 169 (8th Cir. 1971). This, however, is not one of them. Although the appellees had lost a considerable amount because of the decline in Frigitronics, the decision to continue in Frigitronics and hope for a rise in price, rather than to sell and reinvest the proceeds elsewhere, involved precisely that weighing of risk that constitutes an investment decision.

The appellees also argue that it was error to award "market value losses" attributable to the unauthorized sales of the four securities used to fund the Frigitronics purchases. The trial court determined that, in addition to the $68,120 realized loss, the appellees should recover any increase in market value of those securities attained within a reasonable time after discovery of the sale. *See Myzel v. Fields,* 386 F.2d 718, 746 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). The reasonable time chosen varied with the particular stock. It coincided with the highest market value of the stock reached after the unauthorized sale which varied from four months to nine months.[18] The trial court determined that such dates were appropriate "because of the continuing nature of the fraud" and that had they known the true state of affairs "they would have been in a position to cancel or sell [Frigitronics] and recapture a position in the stock sold to fund the purchases of Frigitronics."

■ Although we affirm the amount of the trial court's damage award, we do so for a different reason. As in the purchase of Frigitronics, the relevant time period is the date the appellees no longer relied on the misrepresentations in making their investment decision. The trial court recognized that the appellees were unable to make an informed investment decision because the misrepresentations continued from the time of the unauthorized sale until after Covlin and Newham left Blyth Eastman and a reasonable time thereafter. The appellees are entitled to recover, in addition to the $68,120 realized loss, the difference between the market value of the stock on the date of the unauthorized sales and the highest market value of the stock reached between the date of the unauthorized sale and a reasonable period after Covlin and Newham left the brokerage firm. Since the high market value occurred prior to the time Covlin and Newham left Blyth Eastman, *see* n.18, *supra,* there is no need to remand for a determination of a reasonable time period.

*B. National Liberty and Lennar.*

With respect to these transactions, the trial court awarded total damages of $147,184. The appellants do not contest the award of damages of $13,750 for National Liberty and $6,088 for Lennar which represented the profit that would have been realized if the stock had been sold on the date the sell order was given.[19] The appellants do argue that damages occurring subsequent to the date the sell orders were given should be measured as of the time that the appellees discovered that their sell orders had not been executed rather than the actual selling date.

■ We agree. After the appellees learned of the refusals to sell, they had only

---

18. The high market value was reached for Pacific Southwest Airlines on April 30, 1972, or nine months after the unauthorized sale; for Union Corporation on February 28, 1972, or seven months after the unauthorized sale; for United Refining on February 28, 1972, or seven months after the unauthorized sale; and for Hyatt Corporation on March 31, 1972, or

roughly four months after the unauthorized sales.

19. The appellants argue, however, that the trial court's finding that sell orders were actually given was clearly erroneous. We have previously disposed of this contention. *See* II.B., *supra.*

a reasonable period of time thereafter to decide on a course of action. This reasonable time would obviously be less than the time needed for the Frigitronics decision because the decision to sell had already been made. We remand to the trial court in order to determine the reasonable period of time in accordance with the standards previously outlined.

The trial court also awarded damages for "market value losses" attributable to the unauthorized sales of the two securities used to fund the unauthorized National Liberty purchase. The award was based on the increase in market value of the two securities reached within a reasonable time after discovery of the sale. The reasonable time varied from two months for the Hyatt Corporation stock to eleven months for the Mission Equities stock.[20] The appellants argue that the trial court's measure of damages was proper, but that it chose an unreasonable period of time.

■ We agree with the trial court that the proper measure of damages is the difference between the value of the stock at the time of the unauthorized sale and the highest market value the stock achieved within a reasonable time after the appellees discovered or should have discovered the unauthorized sale. Although these unauthorized sales are similar to the unauthorized sales used to fund the Frigitronics purchases, they are not identical. The appellees, in this unauthorized sale, were not laboring under a continuing series of misrepresentations. After they had learned of the unauthorized sale, they were in a position to make an informed investment decision. As we have previously discussed, this reasonable time depends on numerous factors including the sophistication of the appellees, their contact with brokers and the need to analyze the market. As in the refusal to sell, however, we conclude that a reasonable period of time would be less than the time needed for the Frigitronics decision since the appellees had been holding the stock and were already aware of its relative merits. We remand to the trial court for a determination of a reasonable period of time in accordance with the standards previously outlined.

### C. Prejudgment Interest and Punitive Damages.

■ The trial court determined that the appellees were not entitled to prejudgment interest because their damage claims were unliquidated and they could not be readily ascertained by reference to an available standard. *See Layne-Minnesota p. r., Inc. v. Singer Co.*, 574 F.2d 429, 435 (8th Cir. 1978); *Potter v. Hartzell Propeller, Inc.*, 291 Minn. 513, 518, 189 N.W.2d 499, 504 (1971). We cannot say it erred in doing so.

■ The trial court also awarded punitive damages of $200,000 based on the pendent fraud claim. Although punitive damages are not permitted for violations of § 10(b) of the Securities Exchange Act, punitive damages may be awarded if allowable under state law and a state violation is joined with the Rule 10b–5 claim. *See* Note, *Punitive Damages and the Federal Securities Act: Recovery Via Pendent Jurisdiction*, 47 Miss.L.J. 743 (1976); Hirsch and Lewis, *Punitive Damage Awards Under the Federal Securities Acts*, 47 Notre Dame Law. 72 (1971). It erred in doing so. The principal reason for the award appears to be the desire to compensate the appellees for the use of their money—in effect, an award of prejudgment interest—and to help defray expenses of the lawsuit. Punitive damages are not designed to compensate an injured party, but are designed to punish the offender for his malicious or oppressive conduct.

### IV. Conclusion.

We affirm the liability findings of the trial court. We affirm the award of $17,-568 for the unauthorized purchases of Walter Kidde, Universal Foods and Nicolet In-

---

**20.** The high market value was reached for Hyatt Corporation on March 31, 1972, or two months after the unauthorized sale; and for Mission Equities on December 31, 1972, or eleven months after the unauthorized sale.

strument; the award of $68,120 for actual damages and $83,209 for market value losses for the unauthorized sales of the four securities used to fund the purchases of Frigitronics; and the award of $19,838 for damages as of the date the sell orders were given for National Liberty and Lennar. We affirm the decision of the trial court denying prejudgment interest. We reverse the decision of the trial court awarding $200,000 in punitive damages. In accordance with the procedures previously outlined, we remand for redetermination of the Frigitronics damage award, the damages arising subsequent to the date the sell orders were given for National Liberty and Lennar, and the damages for market value losses attributable to the unauthorized sales of the two securities used to fund the purchase of National Liberty.

The judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.