**HOFFMAN ELECTRIC, INC., Lawrence R. Musselman & Georgiana R. Musselman, as Co–Trustees of the Lawrence R. Musselman and Georgiana R. Musselman Trust, and Walter Winius, Jr., on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,**

v.

**EMERSON ELECTRIC COMPANY, a foreign corporation, Load Management Development Corporation, a foreign corporation and Harold F. Faught, Defendants.**

Civ. A. No. 90–72E.

United States District Court,
W.D. Pennsylvania.

Aug. 11, 1992.

Philip B. Friedman, Ambrose & Friedman, Erie, Pa., for plaintiffs/class.

David F. Dobbins, Patterson, Belknap, Webb & Tyler, New York City, Edwin L. Klett, Klett Lieber Rooney & Schorling, Pittsburgh, Pa., for defendants.

John Michael Clear, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., J. Tomlinson Fort, Joseph C. Bartolacci, Pittsburgh, Pa., for plaintiff/Hoffman Elec.

## OPINION

COHILL, Chief Judge.

On July 8, 1992 this Court held a hearing to approve a class action settlement proposal. We decided to hold this hearing after protracted negotiations between class counsel and defense counsel had resulted in a stalemate. At the hearing we approved the settlement proposal over the objections of class counsel and, consistent with Rule 52 of the Federal Rules of Civil Procedure, read into the record preliminary findings of fact and conclusions of law. This opinion will provide in greater detail our findings of fact and conclusions of law, as well as an explanation of our reasons for approving the settlement.

## FINDINGS OF FACT

### A. The Parties

The plaintiffs were limited partners in Emerson Research Partners ("ERP I"), which was formed to develop, manufacture and market a two-way automatic communication system (TWACS). TWACS was to be used by electric utilities companies to reduce peaks in demand for electrical power through remote control. After years of losses, Emerson offered to purchase ERP I for an amount approximately one-half of the limited partners' initial investment. This offer was contained in a proxy statement. Plaintiffs then brought this lawsuit alleging that the defendant had devised a scheme to buy out ERP I at an unfairly low price.

The defendants are Load Management Development Corporation ("LMDC"), as general partner of ERP I, Harold F. Faught, owner of LMDC and Emerson Electric Company.

In January 1991, this case was certified as a class action. In that opinion, *Hoffman Electric, Inc. v. Emerson Electric, Co.*, 754 F.Supp. 1070 (W.D.Pa.1991), we granted plaintiffs' motion for class certification and granted defendants' motion to dismiss the RICO claim in the complaint.

We also denied defendants' motion for partial summary judgment on the securities claim. Thus, the remaining counts involve a securities claim and pendent state claims. The plaintiffs have also filed a motion to amend their complaint which we decline to address in this Opinion.

Subsequent to that January 1991 Opinion, the parties conducted extensive discovery in preparation for trial. On April 1, 1992, this Court held a status conference with the parties in order to monitor the parties progress in discovery.

### B. Settlement Discussions

Subsequent to the April 1, 1992 conference, the parties entered into settlement discussions. On April 21, 1992, the *defendants* filed an application to send notice to the class regarding their settlement offer. As a result of this, we ordered the parties to appear on May 7, 1992, for another status conference. At this status conference several interesting facts came to light.

First, we heard that defendant Emerson, had negotiated with the Internal Revenue Service ("IRS"), on behalf of the class, a settlement of a dispute over the deductions taken for ERP I over years 1984–1986. At the time of the buyout, the IRS had already challenged certain deductions taken by the limited partners for these years. A condition of the buyout was that LMDC, the general partner and tax matters partner of ERP I, would continue to pay for the services of the Davis, Polk and Wardwell law firm of New York City to negotiate a resolution of the dispute with the IRS on behalf of the limited partners. After three years of tough negotiations, the IRS made an offer that LMDC felt was beneficial to the former limited partners.

We described the IRS settlement offer in our Opinion of June 26, 1992 in the following manner:

Emerson, through Davis Polk and Wardwell, has negotiated a settlement of these IRS claims. The settlement involves other entities aside from ERP I. Under the settlement, the IRS has agreed to assess against LMDC $2.5 million in tax liability. This liability represents the liability of ERP I and ERP II to the IRS for certain disallowed deductions taken by the limited partners of these separate research partnerships. Emerson has estimated that 70% of the total liability is allocable to ERP I. Thus, $1.75 million of the total $2.5 million represents the liability of the ERP I limited partners. Class counsel disputes this calculation. However, we can find no fault with the defendants' figures.

This $1.75 million would satisfy what the IRS and Davis Polk and Wardwell agree is the ERP I limited partners estimated $6,117,587 tax liability. According to the calculations presented by the defendants, the estimated tax liability for each partnership share is $30,900. The settlement allows the parties to satisfy that liability at the reduced price of $8,800 per share. In addition to this benefit, the liability will be assessed against LMDC, not the individual limited partners. Thus, these individuals will not have to file amended tax returns for the years 1984—1986. Also, the IRS has stated that if LMDC pays this liability for the limited partners, it will not consider this monetary benefit to the partners as taxable income. As a result, $1.75 million of this settlement will not be taxable to the members of the class.

Opinion dated June 26, 1992, 800 F.Supp. 1279, 1282. Most importantly for the class, this offer also had a time limit. The IRS originally gave Emerson until June 15, 1992 to accept the offer or it would expire. However, due to this Court's scheduling difficulties and the need to receive the ballots from the class, the IRS extended the deadline to July 10, 1992.

The second interesting development in this case was Emerson's settlement offer. Emerson offered to pay the class members' liability to the IRS and create a cash fund of $250,000 in settlement of this law suit. Class counsel outright refused this offer as undervaluing the claims at issue.

The defendants requested court approval of notice to the class of their settlement proposal, because class counsel had rejected the offer. Class counsel, in turn, reject-

ed the defendants proposed notice and suggested their own. Because the parties could not agree on the form or content of the notice, we approved a compromise. Both parties would send separate notices to the class that would be contained in the same mailing. The defendants agreed to bear the cost of the postage.

Class counsel added a ballot to their notice requesting that the class members express their opinion on the settlement offer. The results of the balloting were inconclusive. Of those that responded, approximately half stated that they needed more information, half said they would like to settle and a few others rejected the settlement offer. However, one plaintiff, class representative plaintiff Hoffman Electric Company, employed the law firm of Reed Smith Shaw and McClay ("Reed Smith") to intervene on its behalf. Hoffman Electric wished to accept the settlement offer over the objections of class counsel and Reed Smith, in turn, filed a motion to intervene to represent the class for the purpose of settlement.

### C. June 26, 1992 Opinion and Order

As a result of the inconclusive balloting and Reed Smith's motion to intervene, we decided to issue a preliminary opinion on the reasonableness of the settlement. We placed the parties on an expedited briefing schedule and required extensive documentation be placed on the record to support the parties' arguments. We issued an Opinion disposing of these issues on June 26, 1992.

In that Opinion we found, preliminarily, that the settlement offer was fair, adequate and reasonable. We also denied Reed, Smith's motion to intervene and scheduled a full settlement hearing for

July 8, 1992. In addition, we ordered the defendants to send a court approved notice to the class.

That notice informed the class of the settlement offer, that the court had preliminarily approved the offer, and that a settlement hearing was scheduled for July 8, 1992. We also included a ballot with the notice. The class was told to return the ballot by July 6, 1992. We also stated that if the class members objected to the settlement, the objections should be filed by July 6, 1992.

### D. Balloting Results

A large percentage of the class members returned their ballots. The total class consists of 220 former ERP I limited partners. 210 of the 220, received notice of the settlement offer. 145 class members voiced their opinion on the settlement ballots by July 6, 1992.[1] 134 of the 145 voted in favor of accepting the settlement, and the remaining 11 rejected the settlement. Thus, 63.8% of the class members voted to accept the settlement while 5.3% rejected the offer.

Many of the class members held less than a full unit of ERP I while some held more than one full unit. Thus, the acceptance percentage changes when viewed in terms of ERP I unit. However, the votes were still overwhelmingly in favor of settlement. Class members representing 57.9% of the ERP I units voted to accept the settlement while class members holding 9.4% of the units voted to reject.[2]

Since July 8, 1992, ten additional class members have sent their ballots.[3] All of these ballots were in favor of settlement. After adding in these ballots, 68.3% of the class members have voted in favor of settlement while only 5.3% have voted to re-

---

1. 135 ballots sent as a result of our June 26, 1992 opinion were received as of the date of the settlement hearing July 8, 1992. However, we also considered the results of the previous balloting at the July 8, 1992 hearing. Ten additional class members voiced support for the settlement through the ballots sent by class counsel in early June. Thus, we considered a total of 145 ballots on July 8, 1992.

2. One of the class members who voted to reject the settlement held 10 units of ERP I. Thus, the rejection percentage is higher than the number of votes to reject.

3. Actually 12 additional ballots were received. However, two of these "yes" votes had already been counted in the previous figures because of their affirmative responses to class counsel's initial ballot.

ject the settlement. After all is said and done, 92.9% of the ballots received have favored settlement and only 7.1% have rejected the settlement offer. In light of these figures, we find that a clear majority of the class members have voted in favor of settlement.

## CONCLUSIONS OF LAW

### A. Class Counsel's Objections to the June 26, 1992 Opinion

In our June 26, Opinion and Order we allowed any class members with objections to the settlement to make them known by filing them with the clerk and the attorneys no later than 4:00 p.m. on July 6, 1992. Class counsel filed an objection to the settlement and attached three affidavits of class members concurring with the objections.

Class counsel objects to the settlement on three grounds: 1) the majority of the class has not approved the settlement; 2) when evaluating the settlement offer in the opinion we considered inadmissable evidence; and 3) we did not add the $400,000 in interest owed on the $2–2.2 million settlement figure.

First, we will simply state again that an overwhelming majority of the class has voted to accept the settlement. No further discussion of this matter is needed.

In their second objection, class counsel argues that this Court considered inadmissable evidence when determining the value of the class claims. Specifically, the plaintiffs assert that evidence of what happened after the buyout in question is inadmissable. In support of this proposition, class counsel cites several cases, none of which are from this district or this circuit. One of these cases states that evidence of events that occur after the buyout is not relevant to the issue of liability. However, the majority of these cases are completely irrelevant. *See, Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989) and *Steinberg v. Chem–Tronics, Inc.*, 786 F.2d 1429 (9th Cir.1986) (Both cases simply state that securities fraud liability cannot be based on failing to make unreasonable predictions); *Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189 (8th

Cir.1978) (Investors can only recover damages up to a certain point.); *Seattle–First National Bank v. Carlstedt*, 678 F.Supp. 1543 (W.D.Okla.1987) (Securities fraud liability cannot be based on events that occur after purchasing the security).

The only case cited by class counsel that is close to being relevant is *Pommer v. Medtest Corp.*, 961 F.2d 620 (7th Cir.1992). This case simply held that when determining liability, the court cannot admit evidence of events that occurred after the materially false statement was made. We did not consider evidence of events after the buyout as evidence of liability but for damages. In our June 26, 1992 Opinion we stated that "even assuming that the proxy statement representing the defendants' offer to the plaintiffs was somehow misleading, the technology on which the partnership was based has done nothing but lose money since the buyout." Opinion dated June 26, 1992, 800 F.Supp. at p. 1281. Thus, the *Pommer* case is not relevant to our opinion and we find no merit to class counsel's second objection.

Class counsel also asserts that ignoring other estimates of the value of ERP I, was inappropriate. Class counsel insists that our previous determination that certain of these valuations were "material" somehow binds us to accept them as true when determining a settlement figure. Our previous finding that the statements may be "material" with regard to a proxy statement, does not mean that we have agreed that the statements are true. Thus, this objection does not provide this Court with any reason to reconsider our finding that this settlement is fair and reasonable.

Class counsel also argues that this Court should add interest in the amount of $400,-000. Whether to award pre-judgment interest is soundly within the discretion of the Court. *See, Gould v. American–Hawaiian S.S. Co.*, 535 F.2d 761, 784–785 (3rd Cir.1976). We decline to impose such interest in this case. The settlement as it stands is fair, adequate and reasonable and we find no circumstances here that would justify imposing pre-judgment interest.

Thus we find no merit in any of class counsel's original three objections.

## B. Objection Raised by Class Counsel During Settlement Hearing

During the July 8, 1992 settlement hearing class counsel raised an additional objection. This objection, while untimely, will be considered by the Court. At the hearing, class counsel argued that because some class members will not benefit from the settlement, it is unconstitutional.

Specifically, class counsel stated that because many of the class members already settled their tax liability with the IRS or, because they paid an Alternative Minimum Tax and did not have the same extensive tax liability as the other class members, that these class members would receive little or no benefit from the settlement. There is no support in the record for this statement.

At the hearing, Mr. David Dobbins, a partner at Patterson, Belknap, Webb and Tyler, designated class counsel, relied on a letter from one class member that was not placed in the record and was not shown to the Court. In that letter, the class member stated, according to Mr. Dobbins, that he had paid an alternative minimum tax and did not have any tax liability to the IRS. We cannot rely on such unsupported statements to defeat a reasonable settlement offer.

Mr. Dobbins also stated that many class members had already paid their tax liability to the IRS. Only one class member returned a ballot stating no opinion on the settlement because he had already paid the tax liability to the IRS. Class Counsel argues that because some of the class members have already settled with the IRS that they will not derive any benefit from the settlement. This is simply not true.

Certain sections of the Internal Revenue Code require the IRS to refund any taxes that individual limited partners have paid when the partnership reaches a settlement with the Internal Revenue Service. These refunds would be sent automatically, but if they are not sent, the limited partner has two years to file a claim with the IRS for a refund. *See,* Sections 6230(d)(5), 6230(c)(1)(B), 6230(c)(2)(B) and 6611 of the Internal Revenue Code. Thus, any class members that have paid their tax liability will be entitled to a refund.

Even if we were to assume that some of the class members will not benefit from this settlement, class counsel's argument that such settlement is unconstitutional has no merit. In support of that argument, class counsel cited *Real Estate Title and Settlement Services Antitrust Litigation,* 869 F.2d 760 (3d Cir.), *cert. denied,* 493 U.S. 821, 110 S.Ct. 77, 107 L.Ed.2d 44 (1989). We find, after careful review of that case, that *Real Estate Title* is totally irrelevant to the constitutionality of this settlement.

In *Real Estate Title,* certain class members challenged whether they were bound by a settlement reached in a class action in federal district court. These class members had never consented to the jurisdiction of the original court, were not within the personal jurisdiction of the original court and had not been given the opportunity to opt-out of the class action. The sole issue before the appellate court was whether this challenge should be heard by the same trial court that approved the settlement.

This case has nothing to do with whether it is constitutional to approve a settlement that does not treat all class members equally. Here, 68.3% of the class has voted to accept this settlement. Only five percent of the class has rejected the settlement. It is clear to this Court that the class wishes to accept this settlement regardless of the position of class counsel. Because, class counsel's only remaining objection is insupportable by either case law or plain common sense we will resolve this objection in favor of the defendants and approve this settlement.

## C. Factors to Consider When Approving A Class Action Settlement

In *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975) the Court of Appeals for the Third Circuit adopted the class action settlement test established by the Court of

Appeals for the Second Circuit in *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974). This test states that the Court must consider nine factors when determining the fairness, adequacy and reasonableness of the proposed settlement. After our consideration of these nine factors, set out in detail below, we find that the settlement is reasonable, fair and adequate.

### 1) *The complexity, expense and likely duration of the litigation.*

Here, the trial, as with all securities fraud trials, will be long and complex. In addition, because of this Court's extensive criminal docket, and the likely length of this trial, we cannot guarantee that this case would go to trial within the next two years. If this case does not settle the litigation will be prolonged indefinitely and the benefits of the settlement with the IRS will be lost. Thus, the complexity, expense and duration of the litigation weigh in favor of settlement.

### 2) *The reaction of the class to the settlement.*

As of the date of this Opinion, 155 of the 210 class members who received notice of this settlement offer have voiced an opinion of this settlement offer. Thus, 73.8% of those class members that received notice have responded. 92.9% of the ballots received expressed a desire to accept the settlement. Thus, 68.3% of the class, representing at least 57.9% of the ERP I units voted to accept the settlement. An overwhelming majority of the class voted to accept the settlement. Thus, the favorable reaction of the class to the offer supports approving this settlement.

### 3) *The stage of the proceedings and the amount of discovery completed.*

Basic fact discovery is fairly far advanced. Discovery is set to close sometime this month, with expert discovery to begin at that time. Thus, the parties have a solid understanding of the facts and the worth of the case. All additional discovery will be in preparation for trial. This discovery, consisting mostly of expert depositions, will not add to the factual basis of the case and will only increase the cost of the litigation. Thus, this is the appropriate time to discuss and approve settlement. This factor also weighs in favor of settlement.

### 4) *The risks of establishing liability.*

After reviewing all the evidence on the record, we find that, it is possible that the plaintiffs could establish liability. However, we also find that a plaintiffs' verdict at trial is questionable. Class counsel's theory of liability is that the defendants had many valuations of ERP I available which they did not provide to the class in the proxy statement. But there is an equal amount of information on the record that these valuations were unreliable. Thus, at best the odds of the plaintiffs receiving a favorable verdict are 50:50, if we consider the evidence in the light most favorable to the plaintiffs. Given the likely possibility that the plaintiffs will not establish liability, this factor suggests approval of the settlement.

### 5) *The risks of establishing damages.*

There is a very high risk here that the plaintiffs will not be able to establish damages above the $2 million offered in this settlement. The technology on which ERP I was based lost money consistently since the buyout. In our June 26, 1992 Opinion we analyzed the reasonableness of the damages that plaintiffs claim and reached the following conclusions:

> Since the date of the buyout one of the only two customers using the [TWACS] system no longer does. In addition, none of the other prospective customers identified by the plaintiffs have purchased the technology. As a matter of fact, Emerson spun off the TWACS business to its shareholders as part of another deal at no additional charge.

The only hard evidence the plaintiff's have uncovered supporting their allegation that the price offered for the limited partners' interest in ERP I was too low is that Emerson's board authorized it to pay $12 million to the ERP I limited partners. While we cannot determine

whether this authorization required Emerson to pay the full $12 million to the class, we can consider the $12 million figure as an estimate of the worth of the company.

Emerson purchased the interest of the ERP I limited partners for $10 million. The board had authorized them to pay up to $12 million. Thus, the plaintiffs could use this difference between the price and the board authorization as proof that the allegedly misleading proxy statement resulted in $2 million in damages. But, given the decline in the business after the buyout, we do not believe that the plaintiffs will be able to prove any additional damages. The value of the settlement proposed by the defendants is $2 million. Thus, the amount of the settlement, in this Court's opinion, reasonably reflects the dollar value of this case. The company went downhill so the class may be better off with this IRS settlement than if they had held onto the ERP I shares.

Opinion dated June 26, 1992, 800 F.Supp. at 1281–1282. Thus, if the plaintiffs can establish damages at all, we believe that the maximum amount will be $2 million. This is the value of the settlement to the class members. Thus, given the evidence and the risk of establishing damages above $2 million, we find that this is a reasonable settlement.

6) *The risks of maintaining a class action through trial.*

The defendants maintain that the plaintiffs will have to show that each class member relied on the representations of the proxy statement in order to maintain a class action. This does not seem to be a terribly difficult task. Thus, we find that this class action most likely could be maintained through trial. Because this class is relatively stable, this factor neither mandates accepting or rejecting the settlement offer.

7) *The ability of the defendants to withstand a greater judgment.*

Emerson Electric Company is a "Fortune 50" corporation. There is no question that the defendants are financially solvent and could withstand a greater judgment. Thus, this factor neither mandates accepting or rejecting the settlement of this action.

8) *The range of the reasonableness of the settlement in light of the best possible recovery.*

This Court has no doubt that this is a reasonable settlement for the class. The total value of the settlement combined with the administrative convenience of the IRS settlement to the class makes this a good offer in light of the limited potential liability of the defendants to the class. Thus, this factor weighs heavily in favor of accepting the settlement.

9) *The range of the reasonableness of the settlement fund to a possible recovery in light of all the attendant risks in litigation.*

This is a very good settlement considering the risk of losing this case at trial. We stated above that the plaintiffs' odds of success are, perhaps, 50:50. However, this trial is likely to be long and complex and very confusing to a jury. With such complex trials, the risks involved in the litigation increase. The cost of the trial will be tremendous. In addition, the experts who will testify have not yet been deposed. With only 50:50 odds and such an expensive trial, we believe that accepting this settlement will be in the best interests of the class.

D. Conclusion as to Settlement

After careful review of the record in this case, a hearing on the merits of this settlement and consideration of the above nine factors, we find that this settlement is fair, reasonable and adequate. Thus, we will approve this settlement over the objections of class counsel. We will also direct the defendants to notify the class of the settlement pursuant to the defendants' Application to Send Notice of Implementation of Court–Approved Settlement which we will grant.

OTHER OUTSTANDING MOTIONS

### A. Motion for Sanctions

█ The defendants filed a motion seeking sanctions against class counsel. This motion for sanctions arises out of a communication sent by class counsel to the class. In this motion, the defendants state that class counsel's notice contained many misstatements regarding this case. Thus, the defendants not only seek sanctions, but also, Court approval to send an additional notice to the class curing the alleged misstatements of class counsel.

While we find that class counsel's behavior in the matter has been somewhat bizarre, we decline to impose sanctions. If this Court is to believe class counsel's fee estimates, they will not recover their investment in this case as a result of this settlement. Any further monetary sanctions will be rubbing salt into the wound.

█ In addition, we will not allow defense counsel to send a curative communication to the class. This class has received several communications from class counsel and defense counsel regarding this settlement. The class also received a notice drafted by this court detailing the term of the settlement. Thus, we feel that the class is so well versed in the terms of this settlement that class counsel's notice could not have confused the class sufficiently to warrant a curative communication.

### B. Reed Smith Petition for Attorneys' Fees, Costs and Expenses

We feel that it is premature to rule on this motion because we anticipate that class counsel will file a similar petition. Thus, we will order any party seeking fees to file their petition, accompanied by a brief, by August 31, 1992. Any party wishing to respond to these petitions should file the response, accompanied by a brief, no later than September 15, 1992.